UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>vs.<br>RACHELLE LYNETTE CARLOCK,<br>Defendant. | Case No. 08MJ8433-PCL<br>El Centro, California<br>Wednesday,<br>May 21, 2008<br>10:30 a.m. |

TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE PETER C. LEWIS
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

| | |
|---|---|
| For the Plaintiff: | FRED SHEPPARD, ESQ.<br>Assistant United States Attorney<br>880 Front Street<br>San Diego, California 92101 |
| For the Defendant: | FEDERAL DEFENDERS OF SAN DIEGO<br>BY: SHEREEN CHARLICK, ESQ.<br>225 Broadway, Suite 900<br>San Diego, California 92101<br>(619) 234-8467 |
| Transcript Ordered by: | SHEREEN CHARLICK, ESQ. |
| Transcriber: | Shonna D. Mowrer<br>Echo Reporting, Inc.<br>6336 Greenwich Drive<br>Suite B<br>San Diego, California 92122<br>(858) 453-7590 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

EL CENTRO, CALIFORNIA WEDNESDAY, MAY 21, 2008 10:30 AM

--oOo--

(Call to order of the Court.)

THE CLERK: We'll take Matter 1 on the calendar, 08MJ8433, USA versus Rachelle Lynette Carlock on for detention hearing.

MS. CHARLICK: Good morning, your Honor. Shereen Charlick, Federal Defenders on behalf of Ms. Carlock.

MR. SHEPPARD: Good morning, your Honor. Fred Sheppard on behalf of the United States.

MS. CHARLICK: Your Honor, may I ask if Ms. Carlock can come and be seated next to Ms. Regan.

THE COURT: I think I'm going to leave that to the discretion of the Marshal's Office. Their decision, I think, is no. She can be seated at the bench there, though.

Okay. This is set for a detention hearing today. Is it going to go forward?

MS. CHARLICK: Your Honor, actually, while it isn't clear from the four corners of the complaint, it's my understanding that there is some sort of link that someone thinks there is between the bombing of the San Diego -- the pipe bomb at the San Diego Federal Courthouse and my client, Ms. Carlock.

And in that case, I need to ask you, your Honor, to recuse yourself because I think that your relationship

working for the District Court judges -- you have been present in the San Diego Courthouse. You are a magistrate who is appointed by the District Court judges. I think under 18 USC Section 455(a) and the cases of United States vs. Clements, United States vs. Nichols and United States vs. Nettles would require you -- simply because of the appearance of impropriety. I'm not suggesting any real bias or prejudice by any means. But the public perception would be that you are closely aligned with all of those judges, and this pipe bomb at the courthouse was indeed a threat against the entire Bench of the San Diego Federal Courthouse.

THE COURT: Okay. I'm going to deny the motion. I'm going to go ahead and set and hear this case. It's not in my courthouse. This is my courthouse. I am in the district, and I do share a relationship with those judges, but I don't think that's going to influence any decision that I make here today. So that motion is denied.

Let's see. Is it Mr. Sheppard?

MR. SHEPPARD: It is, your Honor.

THE COURT: Are you ready to proceed by way of proffer?

MR. SHEPPARD: I am, your Honor. I would ask that a portion of this matter be held at side bar and the record sealed pursuant to the fact that some of the information to

which I'd like to divulge in this detention hearing concern ongoing criminal investigation.

I've talked with counsel and advised her that I'd be making this request. She stated she would have no objection to that.

THE COURT: Okay.

MR. SHEPPARD: I can do the facts now or the items now that you would like or wait until after.

THE COURT: Let's go forward with what you've got now.

MR. SHEPPARD: Your Honor, as you do know, this concerns just from the complaint a purchase of black smokeless powder with fraudulent identification on April 7th and May 1st. On each occasion, two pounds through two bottles, one pound each, of black smokeless powder were purchased with a fraudulent identification. That black powder which is at issue is part of a continuing investigation which I will address at side bar as well.

I would say that during the purchase of that powder on April 7th and May 1st, an identification was presented by the Defendant, and that identification was recorded by those stores concerning those particular purchases. That same identification was presented by this Defendant on May 13th, again, in an attempt to purchase two more bottles, one pound each, of the same black smokeless

powder on May 13th.

And on that occasion, the identification was photocopied. Unbeknownst to the Defendant, a photocopy of that was retained in addition to the fact of video surveillance on occasion of this Defendant purchasing the black smokeless powder.

That same fraudulent identification was on the Defendant's person when she was arrested two days later on May 15th. That was the identification that she was carrying on that date, your Honor, in addition to any other items that she had in her purse.

With regards to various other factors, there's indication in the Pretrial Services report as well as to our knowledge that she does have a father in the San Diego area, but the relationship is unknown as to what that relationship is. And in fact, she has refused to provide any information to Pretrial Services in an attempt to contact and verify the relationship or any assistance that he would provide.

There is mention of four children that the Defendant has, those four children not residing with this Defendant.

Her employment is at Advantage Rental Car. Our information from Pretrial Services is that, in fact, she, according to her, has only been working there approximately five weeks. There is another aspect of that I'd like to

address at side bar as well.

Other than that, there is no indication as to her financial resources. I will state that by the Defendant's own words at various times, she has -- there's alcohol and drug use, been an abuser of crack cocaine nearly her entire life.

Given that so far, we then reach into the criminal history --

THE COURT: Let me ask you, Mr. Sheppard, I just saw some mention of possible use of a controlled substance in her RAP sheet, but how did you -- on what basis are you making the proffer that she has abused rock cocaine her entire life?

MR. SHEPPARD: I can address that matter at side bar, your Honor. I was going to provide that information or the source of that information. It's her own words. I will say that.

THE COURT: Okay.

MR. SHEPPARD: Her own words is what tells us that it's crack cocaine.

THE COURT: Okay.

MR. SHEPPARD: I can tell you that she -- and as your Honor can see from the Pretrial Services report, she does have a criminal record. Not only does it involve various violent acts at certain times, but it also involves

fraudulent or various attempts to deceive at various times, your Honor.

We would ask to take a special note, though, of the numerous failures to appear by this Defendant with regards to a risk of flight. On nearly every particular item of criminal history, she has either failed to appear in court on the court date on several occasions, she has either violated probation on other occasions, or after being sentenced she's violated parole on other occasions.

And in fact, on one particular time she violated parole one, two, three, four, five, six, seven, eight -- six parole violations and two probation violations, your Honor, and that being with regards to a robbery conviction in 1998.

She was just released off of parole -- or probation with regards to a matter in December of this particular year. This card that the Defendant was found on her person, this individual has been the victim of identity theft on another matter or in the past with regards to this.

But what's important here is not that this -- on April 7th she took this card, and she went home and she put the card back at home. And on May 1st, she decided to go and make a fraudulent purchase. She took out the card, she went to the store, made her purchase, went home, put the card away. That is in the case.

The last time she used the card was May 13th, and

two days later she still had the card on her. She carries this card on her, using it or able to use it at any time she wants, your Honor. That is important to know in the fact that for her, that is just something she carries around always to have on her, always to have at her disposal for use in any manner she sees fit, your Honor.

As far as the public information of this goes, that's all I'd like to discuss at this particular point. And I don't know how your Honor would like to --

THE COURT: Now, why don't you come to side bar, then, as to -- as to your other points.

MR. KRUEGER: Your Honor, I'm Paul Krueger (phonetic) for the NBC station in San Diego. May I address the Court just briefly about this?

THE COURT: About a side bar?

MR. KRUEGER: May I just ask the Court to keep in mind that this is a matter of intense public interest and that --

THE COURT: I understand that, but sir, this is an ongoing criminal investigation, and there are certain things that probably the public should not be aware of just at this point. I understand your point.

(Discussion at side bar, off the record.)

THE COURT: Okay. Very good. Anything else, Mr. Sheppard?

MR. SHEPPARD: No, your Honor, not at this time.

THE COURT: Okay. Let's see. Ms. Charlick.

MS. CHARLICK: Yes. Thank you, Judge.

THE COURT: What say the Defense here?

MS. CHARLICK: I want to state first that the Government is moving for detention and bears the burden. And they're moving under two bases, both danger to the community and risk of flight.

In terms of danger to the community, they bear that burden by clear and convincing evidence. And I do not believe that this -- the crimes that she is charged with in the complaint qualify as offenses that the Government can seek detention on grounds of danger. And that's at 3142, and I believe it is going to be (f), where they're discussing a detention hearing and they set forth five enumerated bases, none of which apply here.

The Ninth Circuit has been very clear in United States vs. Twine that a felon in possession of a firearm doesn't qualify as a crime of violence. So that knocks out 3142(f)(1)(A).

And she's not charged with an offense for which the maximum sentence is life in prison or death. It's not a controlled substance offense. It's not a felony where someone has been convicted of two or more offenses described in the other paragraphs (a) through (c), nor is it a felony

that is not otherwise a crime of violence, involving a minor victim or that involves the possession or use of a firearm or destructive device.

And I know that because I looked up how that is defined in 18 USC Section 921. And that section actually says that you have to have an explosive, not just an explosive material. That alone doesn't qualify to make this an offense for which the Government can seek detention based on danger. It has to be an explosive, incendiary or poison gas, bomb, grenade, rocket, missile, mine or device similar to any of the devices described, the bomb, grenade, rocket. And that is not what she's charged with. So the Government can't move to detain her on grounds of danger under the plain language of the statute itself.

So I think that that leaves us with risk of flight.

THE COURT: Okay. Where under (f) -- what exactly are you referring to under (f)?

MS. CHARLICK: 3142(f)(1).

THE COURT: Right.

MS. CHARLICK: It says --

THE COURT: Crime of violence or an offense for which the maximum term of life -- the maximum term is life in prison or death.

MS. CHARLICK: It says under 2332(b)(G), yes.

These particular crimes that she's charged with in the complaint, possession of explosive materials by someone who's been convicted of a felony, use of an identification document falsely to obtain the explosive materials, those offenses, from my understanding, don't qualify under these (a), (b), (c), (d) or (e) as offenses for which the Government can seek detention based on danger.

So it's my position that they can proceed solely on risk of flight and that she can't be detained on danger grounds under the statute.

THE COURT: Well, I think the Court disagrees. But go on. Go ahead and make your proffer.

MS. CHARLICK: Well, in terms of the -- if you're going to disagree and allow the Government to proceed on a danger theory, I made some of my position clear at side bar, but I would request a more substantive hearing and that her Sixth Amendment rights be vindicated and I be allowed to cross-examine the Government officials regarding the nature of this -- the danger claim.

Her prior crimes I don't think indicate any sort of danger. She's been -- most of them are petty with the exception of the robbery. And she was discharged from parole. And in California, as I'm sure the Court is aware, robbery is a fairly broad concept. You can even rob someone by like threatening property, which leads many of us to

often claim that robbery is not at all a crime of violence. It's extremely over broad in California. So I don't want the Court to be misled, since we don't have the facts and circumstances underlying that prior conviction.

In terms of risk of flight as well as speaking to any potential danger, my client is 31 years old. She's a United States citizen. She has lived all her life in San Diego and has all her family in Southern California with the exception of some relatives who live in Georgia, also in the United States.

She had been working. And it is my understanding that she had a good relationship with her supervisor and would have her employment at the Advantage Rental Car where she was a driver who would take the cars when someone returned them to be washed and then bring them back for people to rent them again. And that is my understanding.

To the extent that the Government has something different, then your Honor has conflicting proffers, and perhaps there should be an evidentiary hearing on this matter in order to resolve that issue.

She is a mother of four children. She does have frequent contact with her children, though she does not live with them. But part of the reason for that is she goes to school from 8:00 to 12:00 at Community College studying computers and Word Perfect, and then she goes to work from

3:00 to 11:00. And she has been at her present job a short period of time, but prior to that, she was in school full time. And she has had other various employment.

Her father and uncle, Robert Kaplan -- her father is Gaynor Carlock. And her uncle, Robert Kaplan, her grandmother, Marguerite Coffey (phonetic), her aunt, Catherine Jackson, her boyfriend, Lashon White (phonetic), I had spoke to all of them. They are not people of great means. But they indicated their support. They indicated their disbelief that she would be involved in anything like that, like these charges, and they remain very supportive of her.

They weren't able to come here. This is far from where she's located and where she lives. And her father is a paraplegic. And they couldn't come to court today, but they wanted me to communicate to your Honor their support and continued support of Rachelle throughout these proceedings. They don't have a lot of money.

But I think that under 3142(c)(10) and (11), the Court can't use a financial condition -- if you were inclined to set a bond to address anything but risk of flight, you can't use it to address danger. So I would suggest if you were inclined to set a bond, it should be a very low one, recognizing that you can't use a financial condition to address danger and that she is someone who has

extensive ties in there.

And I agree, the Pretrial Services report -- I haven't seen the underlying documentation -- but does have a certain number of failures to appear. But it also appears that she does end up showing up in court and eventually taking care of these matters and being discharged from probation and parole. And a lot of these are minor matters.

And it doesn't seem that there's anything of any significance in the past year, I think perhaps even longer than that, possibly the past two years at least. Her probation was terminated in December of '07, and the last indication that there was any difficulty is in April of '05.

And I want --

THE COURT: Ms. Charlick, how long did she work for Advantage?

MS. CHARLICK: I believe that she had been working there -- I think it's a bit longer than five weeks. I thought it was the past couple of months.

THE COURT: Did you say -- I thought you said five months. Or was it just five weeks?

MR. SHEPPARD: I believe it was five weeks that I stated, your Honor.

MS. CHARLICK: Approximately two months is my understanding. It wasn't a lengthy period, but it's my understanding --

THE COURT: Prior to that, did she have employment?

MS. CHARLICK: She had been in school prior to that.

THE COURT: Okay.

MS. CHARLICK: And I do want the Court also to keep in mind that the Ninth Circuit has recently indicated in United States vs. Here (phonetic) all the teachings of the Ninth Circuit Bail Reform Act cases, Modamuddy (phonetic) and Townsend, that the presumption is in favor of release and that the Court can look to conditions -- even if the Court were to find there's some issues with respect to flight risk and danger, the Court then -- that's not the end of the inquiry. The Court has to look at what combination of conditions can I use. Is there perhaps a halfway house that she can go into where she's monitored. Is there an individual who could supervise her. Is there GPS. Is there some sort of a drug treatment condition or other type of reporting condition.

And I suggest that there are a great deal of conditions that you could impose and release Ms. Carlock and that that would be the most lawful solution here in light of the presumption in favor of release and the fact that the weight of the evidence is the least significant factor. In order to make that law meaningful, I think that the Court

should look to the conditions that it could set as opposed to detaining Ms. Carlock.

THE COURT: Okay. Anything else?

MS. CHARLICK: Just to note, your Honor, that in terms of the offense itself and the complaint, I don't believe that there's any allegation that there is video of the May 1st and April 7th events.

While there may be video of Ms. Carlock on the May 13th, which I don't concede because I haven't seen it, she did not possess any gunpowder on that day. So in terms of the strength of the evidence as to the incidents where she is accused of actually having the powder itself as opposed to some sort of an attempt, which she isn't charged with, it doesn't seem to me that the evidence proffered is strong.

THE COURT: Let me ask, what are the potential penalties on these counts, Mr. Sheppard?

MR. SHEPPARD: They are for the first two subsections -- I believe it is --

THE COURT: Are we talking about Counts 1 and 2 or --

MS. CHARLICK: Counts 1 through 3 is a 10-year statutory maximum.

MR. SHEPPARD: That's true. With regards to 1028(a)(7) -- and the caption in the complaint has big (A). That is not the body of the complaint which is (a)(7).

Those are five-year maximum penalties.

THE COURT: So Counts 1, 2 and 3 are maximum 10 years.

MS. CHARLICK: Yes.

THE COURT: Counts 4, 5 and -- 6, is it? No. Counts 4 and 5 are what?

MS. CHARLICK: Four and 5 are a 10-year maximum -- statutory maximum as well.

MR. SHEPPARD: Yes.

MS. CHARLICK: Counts 6, 7 and 8 are five years.

MR. SHEPPARD: That's correct.

MS. CHARLICK: And if I might add, your Honor, in terms of the guidelines, I did a rough -- I took a rough look at them, and I meant to bring this up. For the Counts 6, 7 and 8, the guidelines look like a base offense level of seven plus two, which is quite low in terms of a potential penalty.

And taking Counts 1 through 5 at their worst, I think that the base offense level would be a 24. And that would put her -- if we're assuming she's a Category 2 criminal history, which I'm not certain, but no one is at this point, the potential penalty is still only 57 to 71 months, and that doesn't even take into account a discount if she were to enter a guilty plea, not that I'm at all suggesting she should or would.

But 41 months would be something for the Court to look at. And certainly those types of penalties are not ones that would make someone who has all the ties in this particular area want to flee.

THE COURT: Well, let me ask Pretrial Services. Anything to add?

PRETRIAL SERVICES: No, your Honor.

THE COURT: Okay. Well, I've considered the complaint and the affidavit attached to the complaint, the Pretrial Services report, arguments from both counsel.

Do you know what I see is really -- did you say she's 32 years old?

MS. CHARLICK: Thirty-one.

THE COURT: Thirty-one years old. A woman that has taken no responsibility in her life. I look at that RAP sheet, and it's just four children and a RAP sheet that goes from 1995 to 2005 and this offense. It's pretty deplorable. It really leaves no time to raise four children.

The other thing is is -- you know, these are just observations that I am making, and I'll make my ruling in a second. But the other thing that comes to mind is this complete lack of responsibility in showing up for court appearances. And as Mr. Sheppard correctly pointed out, it's almost in every case.

And on that one conviction for robbery -- you

know, I know how these state judges work. And they gave her a chance. The revoked her. They put her a little bit in jail. They revoke her again. They put her some more jail time. Finally they've had it and they put her into prison for two years or she gets a two-year term, and then she's let out on parole, parole, parole, again, again, again, and is revoked on each occasion.

It just shows any -- it shows a disrespect for the law and the rules by which society abide. And that's what concerns me as much as anything, is if I were to set a bond, could she comply with that bond. And I just don't see it.

I'm going to say this right now. I am not going to consider the side bar conference in making this ruling because in my mind, the fact that she has been convicted of a felony and she has attempted to purchase explosive devices, in my mind, that is a crime of violence.

I'm sorry we disagree with that, Ms. Charlick, but it is a crime of violence, and I can find dangerousness to the community. Based on the nature of the offense, I'll find clear and convincing evidence that she is a danger to the community.

As to risk of flight, you know, I -- Mr. Sheppard has stated that this is an ongoing investigation. I don't know where it's going to end up, but I think if she were released on bail, given her track record on prior cases, I

think there's a very good chance that she would fail to make the court appearance.

Thirty-one years old, and she's -- five weeks employment does not speak well of her. If you go through the factors under 3142(g), the nature and circumstances of the offense charged seems to be a serious crime when you're using someone else's identification. And that is on you at all times, as Mr. Sheppard correctly pointed out. I mean, it's not something that she would keep in her house and then go out and purchase -- make a purchase or use that in some way. She was using it -- I mean, she had it available to her at all times.

MS. CHARLICK: Your Honor, if I might correct the record. I'm not sure that's accurate. I think his only supposition about that is because she had it on her when she was arrested.

THE COURT: I think that was -- I think that's an inference that you can draw. And that's the inference that I'm certainly drawing. Why would it be on her if she wasn't making a purchase on the day that she was arrested?

So the weight and the evidence against the person I think is strong at this point as to these charges contained in the complaint. The history and characteristics of the person, her character is pretty much represented in her lack of responsibility. Physical and mental condition.

Not much was said there. Family ties. She does have strong family ties to the area. I would not say her employment is a strong tie, not after five weeks. History of drug use, apparently. And her criminal history, her record concerning appearance at court proceedings.

The only factor under three -- that would be history and characteristics of the person. The only factor that -- I don't think she was on parole or probation at the time, was she?

MS. CHARLICK: No, your Honor.

THE COURT: Okay. And so on that basis anyway, I'm going to find by clear and convincing evidence that she is a danger to the community, and further that she -- by a preponderance of the evidence that is a flight risk. So that will be my ruling.

Mr. Sheppard, if you'd be kind enough to prepare an order. Have that -- submit that to Ms. Charlick before you submit it to me first, if you would.

MR. SHEPPARD: I will, your Honor.

MS. CHARLICK: Your Honor, may I request that she be returned to the San Diego area so she can consult with counsel? She's been sleeping on the floor at the ICJ because of the overcrowding. She has some medical issues that have not been addressed, and I need her near me so that we can consult and prepare in her case. It would be very

important.

THE COURT: You know, I don't know what -- what's the situation -- I mean, I don't know what that situation is. Let me take that under submission.

MS. CHARLICK: Certainly. I could also have --

THE COURT: We'll -- I understand your needs for that, but, you know, I will talk with the Marshal Service and see what's going on, and I'll get back to you.

MS. CHARLICK: Thank you. And I believe Mr. Skerlos, the prosecutor who is also assigned to the case, indicated to me that he did not have any issue with my making that request.

THE COURT: Yeah. Well, you know, it's really kind of a marshal type issue, and I want to see what the arrangements are before I -- you know, we do have a preliminary hearing down here set for the 29th, so she's probably going to be here until the 29th. But I'll look into it.

MS. CHARLICK: Especially her sleeping on the floor and her medical care. If the Court could possibly inquire as well.

THE COURT: What was it about her medical care that you --

MS. CHARLICK: She hasn't had any sort of medical screening, and she does require some medication.

THE COURT: It's interesting that she'd be -- having been booked without some kind of a medical clearance.

MS. CHARLICK: I agree, your Honor. And I was slightly concerned and surprised. And if someone that isn't the case, I would just like to know so --

THE COURT: So Ms. Charlick -- I'm sorry. Ms. Carlock, I have detained you. That's without bond. That's order is without prejudice, so you can raise that issue at a later date, should you wish, should circumstances change. Your next court appearance is going to be for the 29th. You are very well represented. And I'll look into the -- I'll look into sleeping on the floor and the medical screening and that type of stuff. Okay. Very good.

Anything else?

MR. SHEPPARD: Your Honor, I only ask -- and I don't know if your Honor had said it. Just that the portion of side bar transcript be put under seal, not released.

THE COURT: That will be ordered.

MR. SHEPPARD: Thank you, your Honor.

THE COURT: But it's not something that I am basing my ruling on.

MR. SHEPPARD: Absolutely. I understand.

MS. CHARLICK: Nice to see you, Judge.

THE COURT: Thank you. Thank you very much, Ms. Charlick. Appreciate it.

Mr. Sheppard, thank you very much. Nice job by both counsel.

(Proceedings concluded.)

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

s/Shonna Mowrer 6/4/08
Transcriber Date

FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

s/L.L. Francisco
L.L. Francisco, President
Echo Reporting, Inc.